**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| ONEBEACON INSURANCE GROUP, LLC; and ATLANTIC SPECIALTY INSURANCE COMPANY, | : | |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | Civil No. _____ |
| | : | |
| CAPACITY COVERAGE COMPANY OF NEW JERSEY, INC. d/b/a THE CAPACITY GROUP; THE INSURANCE PROFESSIONALS, INC.; and TRANSPORTATION INSURANCE PROFESSIONALS, LLC, | : | |
| | : | |
| *Defendants.* | : | |

## <u>VERIFIED COMPLAINT</u>

Plaintiffs OneBeacon Insurance Group, LLC ("OBIG") and Atlantic Specialty Insurance Company ("ASIC") (collectively, "Plaintiffs") bring this Complaint against Defendants Capacity Coverage Company of New Jersey, Inc. d/b/a The Capacity Group, The Insurance Professionals, Inc., and Transportation Insurance Professionals, LLC (collectively, "Defendants").

1.     This action seeks injunctive relief and compensatory damages against companies that have falsely held themselves out as agents for the Plaintiffs; misappropriated more than $1.6 million in premium payments of Plaintiffs' policyholders – payments that Defendants collected by means of false representations, which Defendants are required to hold in a fiduciary capacity, and which Defendants *admit* are currently owed to the Plaintiffs – and secreted those premiums in a location they refuse to disclose.

2.     Plaintiff ASIC operates a program (the "Tow Program") through which it insures companies whose business involves vehicular towing.  In 2013, ASIC's corporate parent, OBIG (acting for itself and on behalf of its insurer subsidiaries, including ASIC) executed a "Program Administration Agreement" ("PAA") with one of the Defendants, The Insurance Professionals, Inc. ("TIP"), a licensed insurance agent.  The PAA appointed TIP as Plaintiffs' agent and program administrator to (among other things) market insurance for the Plaintiffs' program, quote, bind, and issue new and renewal insurance contracts on their behalf, and collect premiums for those contracts "as a fiduciary" for the Plaintiffs.

3.     When ASIC's policyholders pay premiums to purchase or renew insurance under the Tow Program, they reasonably expect that their premiums will be forwarded to the insurer to pay for their coverage.  Consequently, the PAA required TIP to establish a separate, fiduciary account for premiums, in a bank approved by the Plaintiffs.  TIP established such an account (the "Fiduciary Account") and Plaintiffs' approved it in an addendum to the PAA.  The PAA required TIP to deposit all premiums into that Fiduciary Account within five days of receipt, and to hold them in the account until they were due to be remitted to the Plaintiffs to fund the insurance policies that TIP had bound on behalf of ASIC.  The PAA expressly provided that TIP would act "as trustee" for the Fiduciary Account; TIP is also responsible for premium funds as a fiduciary under applicable state laws.

4.     In May 2015, Defendant Capacity Coverage Company of New Jersey, Inc. ("CCC"), operating under the trade name "The Capacity Group," informed Plaintiffs that it had made an investment in TIP's business, and that it had taken over the financial reporting responsibilities for TIP's work on Plaintiffs' behalf.  In all other respects, the parties'

relationship appeared to remain the same: TIP expressly confirmed that Plaintiffs' contract "still remain[ed] with TIP."

5.      In fact, CCC and TIP had formed a new entity, Defendant Transportation Insurance Professionals, LLC ("TRIP"), which is jointly owned by TIP and All Trans Risk Solutions, LLC, an indirect subsidiary of CCC. CCC and TIP directly control TRIP's day-to-day operations.

6.      In May 2015, without informing the Plaintiffs and with no authority to do so, TIP allowed TRIP to assume all of its rights and responsibilities under the PAA – including quoting, binding, and issuing insurance contracts on behalf of the Plaintiffs and collecting premiums for those contracts. Under the terms of the PAA, none of those rights and responsibilities could be assigned without Plaintiffs' written consent. Furthermore, under Pennsylvania law, no agent may sell, solicit or negotiate insurance contracts in the absence of a written agreement with the insurer that issues those contracts (an "appointment"), which must be filed with the state's Insurance Department. (40 P.S. §§ 310.1, 310.71(a) and (c); 31 Pa. Code § 37.17.) (Similar filings are required for each state in which an agent sells policies.) TRIP has never received an appointment from the Plaintiffs. Thus, for the past year, Defendants falsely held TRIP out to policyholders as Plaintiffs' authorized agent, and they have collected millions of dollars in premiums from those policyholders by means of those false representations.

7.      Although the PAA requires TIP to maintain the Fiduciary Account at a bank selected with Plaintiffs' approval, to deposit all premiums collected from Plaintiffs' policies into the account within five days of receipt, and to maintain the Fiduciary Account "as *trustee*" for the Plaintiffs, the Defendants opened one or more new accounts for the premiums that were

collected by TRIP through its false representations to policyholders, and they did so without Plaintiffs' consent.

8.     Plaintiffs recently began to learn about Defendants' actions, when a dispute arose between CCC and TIP, over which company was responsible for the cost of remitting to the Plaintiffs the premiums that had accrued before CCC's investment.   On April 15, 2016, an employee of CCC sent a letter to the Plaintiffs, asserting that TRIP should not have remitted those premiums (which amounted to approximately $1.6 million); that TIP was solely responsible for them; and, consequently, that TRIP planned to *withhold* from the Plaintiffs more than $1.6 million in policyholder premiums that were "*currently owed to [Plaintiffs]*" (emphasis added).   It was only as a result of this letter (along with the communications which followed it) that Plaintiffs learned TRIP had been purporting to act as its agent, binding policies and collecting premiums, for nearly a year.

9.     Plaintiffs promptly demanded that Defendants immediately stop all activities in which they purported to act with Plaintiffs' authority or in Plaintiffs' name; that all premiums collected on Plaintiffs' policies be returned to the Fiduciary Account identified in the PAA; and that all due and owing premiums be paid.   Defendants have refused to comply with these demands.   On the contrary:   on May 13, 2016, CCC's President and CEO advised the Plaintiffs that Defendants had removed the premiums collected by TRIP from the bank accounts in which TRIP had placed them, and he refused to disclose the current location of those funds.   He would not agree to return the premium, and instead suggested that the Plaintiffs should "work with" him against TIP.

10.     Defendants' actions over the past year – binding policies and collecting premiums on the basis of misrepresentations that TRIP had been appointed as Plaintiffs' agent – violate

multiple obligations TIP owed to Plaintiffs under the PAA.  In addition, Defendants' actions violate Pennsylvania law.  (40 P.S. § 310.71.)  Equally important, even though TRIP and CCC have never been appointed as agents for the Plaintiffs, their actions subject them to all the *obligations* of an actual agent under Pennsylvania law – including being "responsible in a fiduciary capacity for all funds received and collected." (40 P.S. § 310.96; 31 Pa. Code § 37.17.)  Consequently, these Defendants, like TIP, were required to keep all premiums they received in the Fiduciary Account, from which no disbursements could be made, other than for the payment of premiums to the Plaintiffs, the return of premiums to policyholders or the transfer of commissions.  (31 Pa. Code § 37.81.)  Defendants' recent withdrawals for the purpose of secreting premium funds from the Plaintiffs is a further, flagrant violation of the law of this state.

11.    Defendants' actions render them liable to the Plaintiffs for breach of fiduciary duty, breach of contract, tortious interference with contract, fraud, conversion and negligence *per se*.  Defendants' unlawful and deceptive misappropriation of the right to bind contracts and collect premiums on behalf of the Plaintiffs deprives the Plaintiffs of control over their own business and threatens them with irreparable injury to their business reputation and good will. Defendants' unlawful misappropriation and secreting of insurance premiums owed to the Plaintiffs threaten permanently to deprive the Plaintiffs of funds that are supposed to be held in trust for the benefit of Plaintiffs and their policyholders.

12.    By this action, Plaintiffs seek preliminary relief to maintain the status quo and protect themselves and their policyholders from Defendants' conversion and dissipation of premium trust funds.  Specifically, Plaintiffs seek (a) an order preliminarily and permanently enjoining the Defendants from transacting or purporting to transact any business, or otherwise holding themselves out, as agent or agents for the Plaintiffs in connection with the Tow Program;

(b) an order imposing a constructive trust on all policyholder premiums collected by the Defendants in connection with the Tow Program, and prohibiting Defendants from dissipating, converting or secreting such assets; (c) an accounting of all such premiums; and (d) an order directing that all such premiums be deposited in the Fiduciary Account that was previously established for the deposit of policyholder premiums in accordance with the PAA. Plaintiffs also seek compensatory and punitive damages and the costs, including attorneys' fees, of this action.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because the action is between citizens of different States, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

14.    This District is the proper venue for this action, pursuant to 28 U.S.C. § 1391(b)(1), because all Defendants are subject to the personal jurisdiction of this Court, by virtue of their doing business within this District, and, consequently, all Defendants reside within this District, pursuant to 28 U.S.C. § 1391(c).

## THE PARTIES

15.    Plaintiff **OneBeacon Insurance Group LLC ("OBIG")** is a limited liability corporation, formed and existing under the laws of the State of Delaware, with its principal place of business in Plymouth, Minnesota. OBIG is authorized to do business in the State of Pennsylvania and elsewhere.

16.    Plaintiff **Atlantic Specialty Insurance Company ("ASIC")** is a corporation, formed and existing under the laws of the State of New York, with its principal place of business in Plymouth, Minnesota. ASIC is in the business of insuring risks under property and liability

insurance contracts, and it is authorized to do business in the State of Pennsylvania and elsewhere. ASIC is an indirect subsidiary of OBIG.

17.    Defendant **The Insurance Professionals, Inc. ("TIP")** is a corporation, formed and existing under the laws of the State of Arizona, with its principal place of business in Scottsdale, Arizona.

18.    Defendant **Capacity Coverage Company of New Jersey, Inc. ("CCC")** is a corporation, formed and existing under the laws of the State of New Jersey, with its principal place of business in Mahwah, New Jersey.

19.    Defendant **Transportation Insurance Professionals, LLC ("TRIP")** is a limited liability corporation, whose members are TIP, a citizen of Arizona, and All Trans Risk Solutions, LLC, an indirect subsidiary of CCC. All Trans Risk Solutions, LLC is a limited liability corporation with two reported members, RJC Agency, LLC, and ProTrans, Inc. RJC Agency, LLC, was a New Jersey limited liability corporation, but its status as a limited liability corporation was terminated in 2015, and it has no citizenship for jurisdictional purposes. ProTrans, Inc. is a direct or indirect subsidiary of, and is controlled by, CCC. Like CCC, it is a corporation, organized and existing under the laws of the State of New Jersey, with its principal place of business located in Mahwah, New Jersey. CCC and TIP directly control the day-to-day operations of TRIP.

## BACKGROUND OF THE CASE

### A.    OBIG, ASIC, and TIP

20.    Plaintiff OBIG conducts insurance business through direct and indirect subsidiaries. Certain subsidiaries of OBIG, including ASIC, underwrite liability and property insurance for companies whose business involves vehicular towing, such as salvage operations,

repair facilities, body shops, service stations and repossession firms. The business of underwriting, issuing, marketing, selling and administering that insurance is known as OBIG's "Tow Program."

21.     On or about April 1, 2013, OBIG (on its own behalf and on behalf of Plaintiff ASIC and other insurance subsidiaries) entered into a "Program Administration Agreement" (the "PAA") with defendant TIP, an Arizona insurance agency. Under the PAA, TIP was appointed to be the "Program Administrator" – the agent responsible for marketing, distributing and servicing all insurance contracts written for the Tow Program. Policies would be issued by one of more of OBIG's insurer subsidiaries and affiliates, including ASIC.

22.     Specifically, the PAA provided that TIP would serve as Plaintiffs' "representative and agent" for all commercial business written for the Tow Program. (§ 3.01) TIP was given both the authority and the "duty" to solicit, receive, accept, underwrite, rate, quote, bind, issue, transact and endorse insurance contracts that satisfied the Tow Program's guidelines. (§ 3.02 and addendum, § 1.01.) In connection with these activities, TIP was authorized to receive premiums for insurance policies issued by the Tow Program, and to retain commissions out of the premiums it collected. (§ 3.11.)

23.     This broad authority was subject to several important conditions. All of TIP's actions as Program Administrator were subject to Plaintiffs' ultimate authority. (§ 3.06.) TIP was permitted to enter into agreements with third-party agents and producers ("Sub-Agents"), under which the Sub-Agents could solicit insurance business and submit it to TIP (§§ 1.06, 3.13), but TIP was responsible for assuring that all such Sub-Agents maintained statutory appointments as agents of the Plaintiffs (§ 11.02; *see also* 40 P.S. § 310.71; 31 Pa. Code § 37.17), and it was expressly forbidden for TIP to assign its rights and obligations under the PAA, whether in whole

or in part, directly or indirectly.  (§ 16.04.)  Nor could TIP sub-contract any portion of its obligations and duties to a Sub-Agent, or delegate any authority to a Sub-Agent, without Plaintiffs' prior, written consent.  (*Id.*, § 3.04(f).)

24.     Similarly, TIP was permitted to receive premiums from policyholders in the Tow Program, but only "*as a fiduciary* for" the Plaintiffs.  (§ 8.01; emphasis added.)  TIP could retain commissions out of the premiums it collected (§ 3.11), but the PAA expressly provided that "[t]he privilege of retaining commissions shall not be construed as changing [TIP's] fiduciary capacity."  (§ 8.01.)

25.     The PAA further required TIP to establish and maintain "separate and distinct *fiduciary accounts* … into which all premiums collected by the Program Administrator shall be deposited."  (§ 8.02; emphasis added.)  These accounts (the "Premium Accounts") must be in banks selected with Plaintiffs' agreement.  (*Id.*)  All premiums that TIP collected had to be deposited into the Premium Accounts within five days of receipt.  (*Id.*)  TIP was responsible for maintaining the Premium Accounts "*as trustee* for" the Plaintiffs.  (§ 8.04; emphasis added.)  It was prohibited from commingling the premiums to be deposited in those accounts with funds that it held in any other capacity, as well as from "offset[ting]" any balances due with any amounts due under other agreements.  (§§ 8.05, 8.11.)  Pursuant to these provisions, TIP opened the Fiduciary Account that is specifically identified in Addendum 2.0 to the PAA.  These contractual provisions supplemented Pennsylvania law, which provides that an "insurance producer" – *i.e.*, a "person that sells, solicits or negotiates contracts of insurance" – "shall be responsible in a fiduciary capacity for all funds received or collected as an insurance producer." (40 P.S. §§ 310.1, 310.96.)  The law also requires premiums to be maintained in separate

accounts, from which disbursements may be made only for limited, specified purposes. (31 Pa. Code § 37.81.)

26.     The PAA also provided (§ 16.01):

> No amendments to or modifications of this Agreement shall be valid unless made in writing and executed by [Plaintiffs] and the Program Administrator in the form of an Amendment to this Agreement and which specify [sic] the effective date thereof.

The contract is governed by Pennsylvania law, and it provides for arbitration of disputes in Pennsylvania. (§§ 13.01, 13.04, 16.09.)

**B.     CCC Invests in TIP**

27.     Daniel Beaudette is President of the OneBeacon Program Group, and his responsibilities include contracting with general agencies to administer specialty insurance programs offered by OBIG through the OneBeacon Program Group, including the Tow Program. In early 2015, TIP's owners contacted Mr. Beaudette to inform him that they were speaking to an agency that was interested in investing in TIP. The investor was Defendant CCC, which, along with its direct and indirect subsidiaries, is known by the trade name, The Capacity Group. Mr. Beaudette subsequently met with TIP and with Robert Lull, the President and Chief Executive Officer of CCC. Mr. Lull told Mr. Beaudette that CCC was considering an investment in TIP, and that he was, among other things, seeking information about TIP and the Tow Program. Both TIP and CCC represented to Mr. Beaudette that the proposed investment would not result in a change of the majority ownership of TIP, and they led him to believe that, after the investment, business would continue to be conducted, as usual, under the PAA.

28.     On or about May 2, 2015, Mr. Lull informed Mr. Beaudette via e-mail that the investment transaction had "closed" on the previous day.

29.     On May 11, 2015, Plaintiffs received an e-mail message from Ms. Laura A. DiPiazza, who identified herself as Chief Financial Officer of the Capacity Group. Ms. DiPiazza's e-mail stated, in part:  "As you may or may not be aware Capacity has formed a new company [called] Transportation Insurance Professionals effective May 1st and taken the financial reporting responsibilities" relating to the Tow Program.  The email, however, did not describe the purpose of the "new company," nor did it otherwise suggest that TIP would no longer serve as Program Administrator.   The email did not disclose that Defendants intended to stop depositing premium funds in the Fiduciary Account, nor did it request permission to deposit such funds in any other account.

30.     Before responding directly to the e-mail, Mr. Beaudette wrote to TIP's owners on May 12, 2015, asking permission to discuss the finances of the Tow Program with CCC.  That message explained that Plaintiffs "[j]ust wanted to be certain *since our contract[] still remains with TIP*" (emphasis added).  One of those owners, Michael Chernek, responded within minutes: "Yes that will be fine … ."  He did not suggest in any way that any entity other than TIP had become Program Administrator, he did not ask Plaintiffs to appoint a new agent, nor did he request permission to assign any of TIP's rights or delegate any of its responsibilities under the PAA, or to move trust monies to a new bank or account.

31.     Later on May 12, 2015, Mr. Beaudette received another e-mail message from Mr. Lull.  Mr. Lull's message stated, in part:  "We will need to amend the contract to New Entity, but after we get all licenses up to date."  Public records show that TRIP was not incorporated until May 28, 2015.  After May 12, however, none of the Defendants made any further reference to the possibility of amending the PAA to add a new agency, or otherwise allowing anyone other than TIP to administer in the Tow Program.

32.     Thus, after May 12, 2015, TIP and the Plaintiffs appeared to continue doing business as they had before.  CCC was now involved in financial reporting for the Tow Program, but the parties worked from reports that continued to refer only to "The Insurance Professionals" or "TIP."  On June 1, 2015, the parties executed a new Addendum 2.0 to the PAA; the addendum was executed by TIP, and it restated the bank name and account number for the Fiduciary Account in which policyholder premiums were to be held in trust.  The addendum reaffirmed that it was TIP who was acting as the Plaintiffs' agent, and TIP's owners did not suggest that TIP's role had changed in any way.

**C.      The Undisclosed Deal**

33.     As it turns out, CCC did not invest directly in TIP, and the representations that TIP and CCC made to Plaintiffs regarding CCC's role as an investor in TIP were false.  It did form a new entity, Defendant TRIP, which is jointly owned by TIP and by an indirect subsidiary of CCC.  CCC and TIP did not disclose to the Plaintiffs that they had secretly agreed to have TRIP serve as Program Administrator for the Tow Program, in a manner that directly violated several key provisions of the PAA, as well as Pennsylvania law.

34.     To begin with, TRIP began to perform many of TIP's duties as an agent – duties that could not, under the PAA, be sub-contracted or delegated without OBIG's prior, written consent, and which, irrespective of the contract, TRIP could not legally perform without a written appointment by the Plaintiffs, filed with the Insurance Department.  (40 P.S. § 310.71; 31 Pa. Code § 37.17.)  Those duties included the solicitation, quoting, binding, transaction and endorsement of insurance contracts between towing companies and ASIC.  In performing those duties (including executing insurance contracts that purport to bind ASIC), TRIP falsely held itself out as Plaintiffs' authorized agent – even though neither Plaintiff had ever appointed TRIP

as its agent, by written agreement or otherwise, and even though Plaintiffs were wholly unaware of TRIP's activities.

35.     TRIP also began collecting premiums on Plaintiffs' policies.  The PAA prohibited TIP from assigning the right to collect those premiums.  Moreover, TRIP unilaterally opened a new account, into which it deposited the premiums owed to the Plaintiffs – despite the express requirement of the PAA that such accounts be opened only with Plaintiffs' agreement.  The Fiduciary Account in which policyholder premiums were to be held in trust until they were remitted to Plaintiffs was precisely identified in the PAA, and Defendants were not authorized to unilaterally deposit or move the premium trust funds to any other bank or account.  TIP was required to maintain such account "as trustee for" the Plaintiffs, but, in fact, the new account was owned and maintained by TRIP.

**D.     CCC's Ultimatum**

36.     In early 2016, as permitted by the PAA, OBIG and TIP mutually agreed to end TIP's participation in the Tow Program as of July 1, 2016.  The decision was memorialized in a letter by one of TIP's owners, Shane Powell.  Although Mr. Powell's letter was written on TRIP's letterhead, it expressly stated that "*TIP* and [the Plaintiffs] have mutually elected to end our business relationship" (emphasis added).

37.     On April 20, 2016, Plaintiffs received a letter dated April 15, 2016, ostensibly from TRIP, contending that Plaintiffs had actually been "doing business with a new entity" for nearly a year.  This letter was also drafted on "TRIP" letterhead, with the Scottsdale, Arizona address, but it was signed by Matthew Beizer, an in-house attorney for The Capacity Group, who works at CCC's offices in New Jersey.  When he sent the letter, Mr. Beizer was acting on behalf of, and as directed by, CCC.

38.     Mr. Beizer represented that TRIP and TIP had entered into an "asset sale agreement," pursuant to which "TRIP acquired TIP's assets, without assuming its pre-closing debts or other liabilities." In TRIP's view, those "assets" apparently included all of TIP's non-assignable rights under the PAA.

39.     Mr. Beizer's letter referred to a "stat report" concerning premiums relating to the Tow Program. Plaintiffs sent the report to TIP, but Mr. Beizer's letter claimed it had been sent to TRIP. The report showed premiums that were due and owing from TIP, but Mr. Beizer's letter described it as showing that *TRIP* "currently owes" those premiums. The letter went on to discuss previous occasions on which Plaintiffs had supposedly "billed [TRIP]" for premiums that TRIP had allegedly paid. The letter actually described TIP as "a different, unrelated entity" from TRIP – despite the fact that TIP is one of TRIP's two owners.

40.     In short, the letter indicated that TRIP, rather than TIP, had been functioning as Program Administrator for the Tow Program. A follow-up letter of April 25 (also from Mr. Beizer, and on the same letterhead) confirmed that suggestion.

41.     The occasion for these letters appears to be a dispute between CCC and TIP over the details of the alleged "asset sale agreement" between TIP and TRIP, or the investment by CCC in TIP's business. TRIP, according to the letters, had remitted to Plaintiffs approximately $2.4 million in premiums for policies that had been sold by TIP before May 2015. According to Mr. Beizer, those premiums should have been remitted to Plaintiffs by TIP, and should not have been remitted by TRIP. Consequently, TRIP contended that it could "offset[]" the amount of those premiums "against any amounts currently owed to OneBeacon" – in spite of the express prohibition against "offset[ting] any balances due" in Section 8.11 of the PAA. On April 25,

Mr. Beizer stated that $1,655,000.00 "which otherwise would have been due to" the Plaintiffs had been "set aside in [an unidentified] trust account pending resolution of this issue."

42.     In other words, TRIP declared that it could withhold for its own benefit more than $1.6 million in premiums – policyholder premiums that were trust funds, which TRIP never had any right to collect in the first place, and which TIP was permitted to receive solely "as fiduciary" for the Plaintiffs.

43.     In response to Mr. Beizer's letters, Dan Beaudette reviewed records of the Tow Program, and he learned that premiums from the Program had not been deposited into the Fiduciary Account set up in accordance with the PAA.  Instead, those premiums had been deposited into one or more new accounts that Plaintiffs had never approved.  Moreover, Defendants were already using the new account in June 2015, when one of TIP's owners signed Addendum 2.0 to the PAA, stating that premiums would be deposited solely into the original Fiduciary Account.  Sometime in April or May 2016, Defendants withdrew the funds from the unauthorized *new* accounts, without consulting the Plaintiffs, and without disclosing where the funds moved.

44.     Plaintiffs duly rejected TRIP's demands and revelations.  On April 29, 2016, they notified Defendants, by e-mail, that they were suspending TIP's authority to write new business under the PAA, and that any outstanding quotes for business with an inception date on or after May 16, 2016, were to be rescinded immediately.  By letter of May 2, 2016, Plaintiffs demanded that all past-due premiums be immediately remitted to OBIG, and that all other premium funds be returned immediately to the approved Fiduciary Account.

45.     Rather than comply with Plaintiffs' demands, Defendants doubled down on demands of their own.  In a conference call on May 13, 2016, Mr. Lull admitted that CCC and

TRIP were in control of Plaintiffs' policyholder premiums, and Lull would not agree to remit to Plaintiffs the more than $1.6 million in past due premiums received from policyholders who thought they were paying for their ASIC towing coverage.

46.     In the same call, in response to a direct question, Mr. Lull refused to disclose where OBIG's premiums are being held, unless OBIG would agree to "work with" CCC against TIP.

47.     TRIP and/or CCC remain in possession of $1.655 million of policyholder premium trust funds that were removed from the Fiduciary Account.

**AS AND FOR A
FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
(BREACH OF FIDUCIARY DUTY)**

48.     Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 47 above, as if fully set forth herein.

49.     Under the PAA, TIP was appointed to be Plaintiffs' "representative and agent" for business related to the Tow Program.  (§ 3.01.)  As agent, TIP owed a fiduciary duty to the Plaintiffs, irrespective of the other terms of the PAA.  That is, TIP had a duty to act with the utmost good faith in furthering and advancing Plaintiffs' interests, including a duty to disclose to the Plaintiffs all relevant information.  Additionally, the PAA expressly provided that TIP could receive premium payments only "as fiduciary" for the Plaintiffs.  (§ 3.11.)

50.     Although CCC and TRIP were not parties to the PAA, and were never appointed to be agents for the Plaintiffs in connection with the Tow Program, those Defendants also owed Plaintiffs a fiduciary duty.   Under Pennsylvania law, any insurance producer "shall be responsible in a fiduciary capacity for all funds received or collected as an insurance producer." (40 P.S. § 310.96.)  Thus, TRIP and CCC owed a fiduciary duty for funds they collected on

- 16 -

policies issued by the Plaintiffs, even though they did so without an appointment, and without authorization to collect, hold, or remit premiums. Furthermore, "[a] person who is responsible for the collection ... of premiums for insurance policies shall be deemed to be performing as an agent ... ." (31 Pa. Code § 37.17.) TRIP assumed responsibility (albeit unlawfully) for the collection of premiums under the terms of the policies it sold on Plaintiffs' behalf. In short, by falsely holding out TRIP as an insurance agent for the Plaintiffs, all Defendants *assumed the duties of such an agent* by operation of law. That is, they assumed a duty to act with the utmost good faith in furthering and advancing Plaintiffs' interests, including a duty to disclose to the Plaintiffs all relevant information.

51.     Defendants breached their fiduciary duty to the Plaintiffs in several different ways:

a.     By allowing TRIP, a company that had not been appointed by the Plaintiffs, to solicit and bind insurance contracts with Plaintiffs' customers, in direct violation of Pennsylvania law;

b.     By refusing to remit premiums that were due and owing to the Plaintiffs, for the ostensible purpose of resolving a dispute between two of the Defendants;

c.     By refusing to disclose the location of policyholder premiums that had been moved from (or never deposited in) the Fiduciary Account, unless Plaintiffs agree to "work with" Defendants to resolve the Defendants' internal dispute;

d.     By transferring funds that were due and owing to the Plaintiffs to an undisclosed location;

e.     By depositing premiums collected from Plaintiffs' insurance policies into bank accounts that Plaintiffs had not approved, despite Defendants' knowledge that Plaintiffs demanded a role in selecting such accounts; and

f.     By failing to disclose, for nearly a year, the fact that TRIP was unlawfully soliciting and binding insurance contracts with Plaintiffs' customers, and that Plaintiffs were depositing premiums into an unauthorized account.

52.     As a result of Defendants' breaches of their fiduciary duty, Plaintiffs have suffered and will continue to suffer serious and irreparable injury to the reputation and good will of their business, as well as the loss of millions of dollars in premiums.

**AS AND FOR A
SECOND CLAIM FOR RELIEF AGAINST DEFENDANT TIP
(BREACH OF CONTRACT)**

53.     Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 52 above, as if fully set forth herein.

54.     The foregoing acts of TIP violated the express terms of the PAA in several important ways:

    a.    Beginning in or about May 2015, TIP failed to perform its "duty to solicit, receive, accept, underwrite, rate, quote, bind, issue, transact and endorse Policies," pursuant to Section 3.02 of the PAA;

    b.    In or about May 2015, TIP allowed TRIP to perform duties under the PAA that TIP was prohibited from assigning or delegating, without Plaintiffs' knowledge or consent, in violation of Sections 3.04(f) and 16.04 of the PAA;

    c.    Beginning in or about May 2015, TIP permitted TRIP to perform functions that may only be performed by a duly-appointed Sub-Agent under the PAA, without assuring that TRIP received and maintained the appointment by Plaintiffs that was required by law, in violation of Section 11.02 of the PAA;

    d.    Beginning in or about May 2015, TIP failed to deposit premiums collected on behalf of the Plaintiffs into the Fiduciary Account that had been established in accordance with the terms of the PAA, and, instead, allowed such premiums to be deposited into an account the Plaintiffs had not approved, in violation of Section 8.02 of the PAA;

    e.    Thereafter, TIP failed to maintain collected premiums "as trustee" for the Plaintiffs, and it improperly sought to offset balances due to the Plaintiff with balances purportedly due under an agreement between TIP and TRIP, in violation of Sections 8.04 and 8.11 of the PAA; and

    f.    By failing to notify the Plaintiffs of the foregoing violations, TIP prevented the Plaintiffs from enjoying their contractual right to exercise

ultimate authority over TIP's actions in connection with the Tow Program, as provided in Section 3.06 of the PAA.

55.     As a result of the foregoing breaches of contract by TIP, Plaintiffs have suffered and will continue to suffer serious and irreparable injury to the reputation and good will of their business, as well as the loss of millions of dollars in premiums.

**AS AND FOR A**
**THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS CCC TRIP**
**(TORTIOUS INTERFERENCE WITH CONTRACT)**

56.     Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 55 above, as if fully set forth herein.

57.     At all times relevant hereto, Defendants CCC and TRIP were familiar with the existence and terms of the PAA.  Among other sources of that knowledge, Defendants learned about the PAA in the course of the "due diligence" they performed before CCC's investment in TIP.  Mr. Lull, CCC's Chairman and Chief Executive Officer, specifically referred to the PAA in his e-mail to Mr. Beaudette of May 12, 2015.

58.     Despite their knowledge of and familiarity with the PAA, CCC, and TRIP wrongfully solicited and induced TIP to violate that contract in all the ways set forth in Paragraph 54 above.  Defendants solicited and induced these breaches of contract, knowing that they would seriously harm the Plaintiffs.  These actions render Defendants CCC and TRIP liable to the Plaintiffs under the common law of tortious interference with contract.

59.     As a result of the foregoing tortious interference by Defendants CCC, and TRIP, Plaintiffs have suffered and will continue to suffer serious and irreparable injury to the reputation and good will of their business, as well as the loss of millions of dollars in premiums.

**AS AND FOR A**
**FOURTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS**
**(FRAUD)**

60.     Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 59 above, as if fully set forth herein.

61.     Beginning in or about May 2015, TIP stopped performing its duties as Program Administrator under the PAA, and, instead, Defendants began falsely and unlawfully holding out TRIP as an agent authorized to bind insurance contracts and collect premiums on behalf of the Plaintiffs.

62.     Between May 2015 and April 15, 2016, Plaintiffs and Defendants had regular communications about the Tow Program, in which Plaintiffs repeatedly expressed their belief that TIP was continuing to act as Program Administrator.  For example:  On May 12, 2015, Mr. Beaudette wrote to the owners of TIP, stating, "our contract[] still remains with TIP," and Mr. Chernek responded by saying, "Yes."  The following month, OBIG sent "stat reports" to CCC, indicating that it was preparing the reports for TIP.  In the meantime, CCC's Chairman and CEO, Mr. Lull, acknowledged in writing that to replace TIP as Program Administrator, the parties would "need to amend the contract to New Entity."

63.     Defendants also made affirmative statements to the Plaintiffs conveying the message that nothing about the parties' relationship had changed.  On June 1, 2015, Mr. Chernek executed a new copy of "Addendum 2.0" to the PAA.  This Addendum specifically identifies the Fiduciary Account that had been opened by TIP with the agreement of the Plaintiffs.  On that date, Defendants had already stopped using that account, and (in direct violation of the PAA) they had begun depositing premiums in a different account established by TRIP, but they gave no indication of those facts when they submitted this document to the Plaintiffs.

64.     Similarly, in early 2016, in connection with the agreement to terminate the PAA later in the year, TIP's other owner, Mr. Powell, wrote that "TIP and [the Plaintiffs] have mutually elected to end our business relationship."   Nothing about that letter indicated that (as Mr. Beizer would later claim) Plaintiffs were "engaged in business with TIP" only *before* TRIP had been formed, but, thereafter, Plaintiffs had been "doing business with a new entity."

65.     Knowing that Plaintiffs had reason to believe, and did believe, that TIP was continuing to act as Program Administrator, and that its duties were not being performed by an entity that could not lawfully perform them, the Defendants never disclosed the true state of affairs to the Plaintiffs before April 15, 2016.  Especially because all of the Defendants owed a fiduciary duty to the Plaintiffs throughout this period, Defendants' statements and omissions constitute affirmative misrepresentations about what entity was binding policies and collecting premiums on behalf of the Plaintiffs.

66.     Plaintiffs relied on Defendants' misrepresentations, by allowing them to continue to bind insurance contracts, by allowing them to continue to collect premiums (including the premiums that are now being wrongfully withheld), and by paying the Defendants commissions. Plaintiffs would not have done so had they known that the policies in question had been solicited and bound by an unauthorized entity that was holding itself out as Plaintiffs' agent in direct violation of law.

67.     As a result of Defendants' misrepresentations and Plaintiffs' reliance on them, Defendants are liable to the Plaintiffs under the common law of fraud.

68.     As a result of Defendants' fraud, Plaintiffs have suffered and will continue to suffer serious and irreparable injury to the reputation and good will of their business, as well as the loss of millions of dollars in premiums and commissions.

## AS AND FOR A
## FIFTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
## (CONVERSION)

69.     Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 68 above, as if fully set forth herein.

70.     Defendants are refusing to remit to the Plaintiffs more than $1.6 million in premiums.  Defendants are maintaining that refusal, despite having received these premiums in the capacity of fiduciaries for the Plaintiffs, despite having expressly *admitted* that these premiums are "currently owed to [the Plaintiffs]," and despite Plaintiffs' written demand for them.

71.     By continuing to deprive the Plaintiffs of these funds, despite Plaintiffs' express, written objection, and despite admitting Plaintiffs' right to them, Defendants are liable to the Plaintiffs under the common law of conversion.

72.     As a result of Defendants' conversion of funds, Plaintiffs have suffered and will continue to suffer serious and irreparable injury, in an amount to be determined at trial.

## AS AND FOR A
## SIXTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
## (NEGLIGENCE PER SE)

73.     Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 72 above, as if fully set forth herein.

74.     The foregoing actions of the Defendants violate several statutes and regulations that were enacted to protect both insurers and the public at large.  By causing TRIP to purport to act on behalf, and as a representative, of the Plaintiffs, without TRIP's having been appointed by the Plaintiffs, Defendants violated 40 P.S. § 310.71.  By failing to disclose their scheme to the Plaintiffs, and by misappropriating the funds they purported to collect on Plaintiffs' behalf,

Defendants have violated the statutes and regulations under which they are "deemed to be performing as an agent" and "responsible in a fiduciary capacity for all funds received." (31 Pa. Code § 37.17; 40 P.S. § 310.96.)  By disbursing funds that they collected as premiums for the purposes of forcing the Plaintiffs to intervene in Defendants' internal dispute, Defendants also violated 31 Pa. Code § 37.81.

75.     Defendants' violations have directly injured the interests of the Plaintiffs and jeopardized the interests of policyholders – both of which these statutes and regulations were designed to protect.  By falsely holding out TRIP as an agent that could bind insurance contracts and collect premiums, Defendants deprived the Plaintiffs of control over their own business, exposing them to damage to their business reputation and good will.  By failing to act as a fiduciary with respect to premiums collected on Plaintiffs' behalf, and by disbursing those premiums in a forbidden manner, Defendants have deprived the Plaintiffs of their property and created a serious risk that Plaintiffs will never recover it.

76.     Defendants' flagrant violations of applicable statutes and regulations therefore render them liable to the Plaintiffs under the common law of negligence *per se*.

77.     As a result of Defendants' *per se* negligence, Plaintiffs have suffered and will continue to suffer serious and irreparable injury to the reputation and good will of their business, as well as the loss of millions of dollars in premiums.

**WHEREFORE**, Plaintiffs OneBeacon Insurance Group LLC and Atlantic Specialty Insurance Company demand judgment:

A.     Preliminarily and permanently enjoining the Defendants from transacting, or purporting to transact, any business on behalf of the Plaintiffs, or otherwise holding themselves out as agent or agents for the Plaintiffs

(whether by issuing insurance policies or otherwise exercising the "pen" of ASIC or any other insurance subsidiary of OBIG, or by any other action), in connection with the Tow Program;

B.      Imposing a constructive trust on behalf of the Plaintiffs over all past, present and future premiums collected by any of the Defendants in connection with policies issued by the Plaintiffs;

C.      Directing Defendants to provide an accounting of all past, present and future premiums collected by any of the Defendants from policies issued by the Plaintiffs, which accounting shall include complete records of any and all accounts into which such premiums have been deposited;

D.      Directing that all past, present and future premiums collected by any of the Defendants in connection with policies issued by the Plaintiffs be deposited, pending further order of the Court, in the Fiduciary Account that was previously established for the deposit of premiums in accordance with the PAA;

E.      Awarding compensatory damages, in the amount of any unpaid premiums collected by the Defendants, as well as any commissions paid by the Plaintiffs after May 1, 2015, which amount shall be calculated at trial;

F.      Awarding punitive damages in an amount not less than $1,000,000;

G.      Awarding the costs and expenses, including attorneys' fees, of this action; and

H.      Awarding such other and further relief as is just.

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER

Dated:  May 18, 2016

Alan C. Promer (Attorney I.D. No. 81006)
apromer@hangley.com
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103
Telephone:  (215) 496-7044
Facsimile:  (215) 568-0300

Julianna Thomas McCabe
*(pro hac vice to be filed)*
jtmccabe@carltonfields.com
CARLTON FIELDS JORDEN BURT, P.A.
Miami Tower, Suite 4200
100 S.E. Second Street
Miami, Florida 33131
Telephone:  (305) 530-0050
Facsimile:  (305) 530-0055

Robert D. Helfand
*(pro hac vice to be filed)*
rhelfand@carltonfields.com
CARLTON FIELDS JORDEN BURT, P.A.
One State Street, Suite 1800
Hartford, Connecticut 06103
Telephone:  (860) 392-5000
Facsimile:  (860) 392-5058

*Attorneys for Plaintiffs,*
*OneBeacon Insurance Group, LLC and*
*Atlantic Specialty Insurance Company*

## **VERIFICATION**

Dennis Crosby, of full age, being duly sworn according to law, upon his oath deposes and says:

I am the Executive Vice President of OneBeacon Insurance Group, LLC. I have reviewed the allegations made in this Verified Complaint and upon various sources of information and documents, as well as my own involvement where applicable, I believe these allegations to be true.

_____
Dennis Crosby

Sworn to and subscribed before me
this _16th_ day of May, 2016.

_____
Notary Public



LINDA KAY WING
NOTARY PUBLIC - MINNESOTA
My Commission Expires
January 31, 2018